PETROPLUS, JUDGE:
This is a claim by Russell Transfer, Inc., a non-resident common carrier corporation, duly authorized to do business within the State of West Virginia, and also authorized as a carrier in interstate commerce under the authority of the Interstate Commerce Commission, against the Commissioner of Finance and Administration, the Director of the Division of Purchases, and the Governor of the State of West Virginia, for damages in the amount of $183,496.00. The issue is whether a binding contract was executed between the claimant and the respondents obligating the State of West Virginia, acting through its responsible officers, to pay for services for the transportation and warehousing of all alcoholic beverages throughout the State for a period of one year beginning July 1, 1972. The contract which was introduced in evidence is dated May 31, 1972, and was signed by Russell Transfer, Inc., a corporation, with the signatures of its President and Secretary-Treasurer, with corporate seal attached, and with the signature of the West Virginia Alcohol Beverage Control Commissioner, J. Richard Barber. The contract was stamped approved as to its provisions and terms by signatures of Ben E. Rubrecht, Director of the Purchasing Division, and John M. Gates, Commissioner of Finance and Administration. The contract *41 was also approved as to form by Chauncey H. Browning, Jr., Attorney General, by T. O’Brien, Assistant Attorney General. From all indications it is a completely executed contract complying with all of the requirements and provisions of Chapter 5A, Article 3, of the West Virginia Code, applying to the purchase of commodities and printing by the departments of the State government through a process of requisition by a spending agency, solicitation of bids after publication of notices based on specifications, submission of sealed bid proposals, and awarding of the contract to the lowest responsible bidder, after taking into consideration the conformity of the bids to standard and special specifications and the requirements of the State government. The so-called “liquor hauling contract” for the previous year (1971-1972) had been awarded to a West Virginia carrier known as Tower Lines, Inc., by following the same bidding procedures. After the Division of Purchases advertised for bid proposals for the transportation of alcoholic liquors, store supplies and equipment, and the issuance of bid forms and copies of the" blank contract to eleven motor frieight carriers, only two bids were received, one from Tower Lines, Inc., a West Virginia corporation, offering a rate of 20.42 cents per standard case, and one from the claimant, a non-resident corporation, at a rate of 19.6 cents per standard case. The claimant submitted one signed copy of the contract with its bid.
The claimant is aggrieved because the State, after submission of the claimant’s low bid and execution of the contract as previously stated, and after the claimant had fully complied with all the terms and conditions of its bid in preparation for the performance of the contract, and its execution by J. Richard Barber, ABC Commissioner, the Department of Finance and Administration wrongfully refused to release a purchase order and permit the claimant to perform its contract, notwithstanding the contract had been signed and approved by Ben E. Rubrecht, Director of the Purchasing Division, John M. Gates, Commissioner of Finance and Administration, and Chauncey H. Browning, Jr., Attorney General. No executed copy of the contract was ever delivered to the claimant. It appeared that the refusal to honor the alleged contract was attributable to the intervention of William Loy, Administrative Assistant to Arch A. Moore, Jr., Governor of the State of West Virginia. The Governor had previously established an administrative policy that in weighing *42 bids for the purchase of commodities and services consideration should be given to the fact that West Virginia bidders were adding to the tax base by employing West Virginia people, and paying West Virginia income and business and occupation taxes. He had suggested that a scale be followed in weighing the relative advantages of an in-state bid as opposed to an out-of-state bid, although no definite formula had been devised. Governor Moore testified that the public policy so articulated had not been implemented by statute as it had been in other states, some of which by law prohibited out-of-state bidders on certain types of contracts. He also testified he had requested the legislature to adopt such a policy by statute in the public interest affording a degree of priority to West Virginia residents over out-of-state bidders, but the legislature had neglected to take any action on this matter. The Governor was also of the opinion that the statute which provided for competitive bidding and award of a contract to the lowest responsible bidder was flexible enough to permit that some preference be given to West Virginia vendors and that his policy was reasonably within the framework of existing law. No rules or regulations were reduced to writing in articulating the preferential treatment to be given to West Virginia vendors. This policy had not been formally communicated to John M. Gates, the Commissioner of Finance and Administration, when he took office, although his predecessor was aware of it. The Governor’s subordinates were aware of this policy and were given full discretion to see that the policy was carried out.
Pursuant to the aforesaid policy, the Department of Finance and Administration on intervention after the complete execution of the contract, refused to honor the contract, destroyed a purchase order issued and signed by the Director of Purchases, and requested new bids to be submitted on July 6, 1972, with no change in the specifications or the contract, with one exception, —the phrase “All labor must be union organized” was inserted in the specifications inviting new bids, and the contract was awarded to Tower Lines, Inc., as the only eligible bidder. The claimant alleges that such action on the part of the State violated the legislative intent of the bidding statutes, unreasonably discriminating against the claimant who was not union-organized, and that the citizens of this State were deprived of transportation at the lowest cost and that public revenues were being expended to purchase services generated exclu *43 sively by union labor. The Governor’s office was charged with frustrating the contract and the Division of Purchases and the Alcohol Beverage Control Commissioner have taken the position that the performance of the contract is beyond their control. Commissioner Gates and Director Rubrecht are charged with arbitrary refusal to release a purchase order in clear violation of Chapter 5A, Article 3, of the West Virginia Code.
As the successful low bidder the claimant took all of the necessary steps to qualify for vendor registration, undertook a thorough investigation of all the services contemplated, engaged in conferences with J. Richard Barber, Commissioner, and after the opening of the bids in reasonable anticipation of securing the contract as the lowest responsible bidder, the claimant applied for and received a permit from the Public Service Commission of the State of West Virginia to operate as a contract carrier with temporary authority, obtained insurance coverage and subscribed to the West Virginia Workmen’s Compensation Fund, furnished a performance bond and coverage under the West Virginia Unemployment Compensation Law and acquired ten trailers and two tractors of specialized equipment, uniquely adapted to the performance of the contract, and otherwise incurred expenses in the aggregate amount of $83,496.00, as well as procured a lease for a building in Charleston to be used as a warehouse. The total amount of damages including loss of earnings on the contract, allegedly caused by the default on the contract, are in the amount of $183,496.00.
A copy of the executed contract was not delivered to the claimant and althoügh it made numerous inquiries concerning the same, it appeared that the State’s agents refused to furnish an executed copy for the reasons heretofore mentioned. A blank copy of the contract was delivered to the claimant on June 5, 1972, by a letter from the Department of Finance and Administration confirming conversations relating to a performance bond, insurance coverage, and workmen’s compensation. The witnesses for the claimant, all State employees, testified that as the apparent low bidder, the claimant fully complied with all of the laws of the State of West Virginia and all the procedures and regulations and requirements of the ABC Commission and furnished to the appropriate State agencies all of the documents required to be furnished in contemplation of performing the contract. They also testified that they were satis *44 fied with the capability and competence of the claimant to perform the services contracted for. It was further brought out that in the bidding and re-bidding procedures, notices were sent to carriers incorporated in Ohio, Pennsylvania, and other states and that the Purchasing Division personnel were not aware of the Governor’s policy to accord preference to West Virginia vendors and that in handling approximately five hundred purchases for the State of West Virginia the Division never endeavored to give the slightest preference to West Virginia vendors or to vendors who utilized union labor. It was further developed there was no written memor-anda or directives implementing the Governor’s policy.
The State’s position reduces this claim to a simple issue, the State taking the position that notwithstanding the claimant’s performances, the contract had never been fully executed, and that something remained to be done before the contract would be legally effective, namely, the issuance of a purchase order and delivery of a copy of the executed contract to the claimant. At this point comment will be made on the testimony of the buyer in the Division of Purchases, namely Donald D. Karle, who testified that a purchase order had been issued on the contract in question and had been destroyed as a piece of paper that shouldn’t be in the file. Mr. Karle stated no one instructed him to destroy the purchase order which had been signed by the Director of Purchasing, Ben E. Rubrecht, the Commissioner of Finance and Administration, John Gates, and approved by the Attorney General. It is apparent that the purchase order was destroyed after William Loy, the Senior Administrative Assistant of Governor Moore, interceded and requested that the contract be held up because of the Governor’s policy favoring resident vendors over non-resident vendors, and union labor over non-union labor. The testimony of William Loy on this matter was quite vague and in effect indicated that mistakes had been made which were subject to correction because the contract had not been finalized by the issuance of a purchase order. Mr. Loy was quite hazy as to whom he contacted in the Division of Purchases in his efforts to hold up the contract and had no recollection who called him and complained about the contract award to a nonresident non-union vendor. Mr. Loy had difficulty in explaining why he undertook on his own initiative to hold up the issuance of a purchase order. He did testify, however, that he assumed respon *45 sibility to hold up the contract because of an existing State policy as articulated by the Governor favoring West Virginia vendors and union labor. He was not aware that the contract had been completely executed, or even that a contract was in existence.
Donald D. Karle, an employee of the State in the Purchasing Division of the Department of Finance and Administration, testified that at no time did he discourage the claimant from expending substantial funds to procure equipment required in the performance of the contract and that in his negotiations with the claimant assumed that the contract had been awarded until he was advised by the Director of the Department, Ben E. Rubrecht, verbally, that no purchase order would be released at this time because the specifications were to be changed. This notifiication came approximately a month after the sealed bids had been opened. In searching his memory, Mr. Karle testified this was the only contract of which he was aware that once executed by an apparent low bidder, who had taken all of the interim steps necessary to perform, was can-celled or held up by the refusal to issue a purchase order. On June 21, 1972, Mr. Barber, the ABC Commissioner, requested the cancellation of the contract. The Russell Transfer, Inc., claimant, was not notified of the cancellation and continued to make preparations and to spend money until the notice of re-bidding on July 6, 1972.
At the re-bidding procedure, Russell Transfer, Inc., submitted a bid of 18.9 cents per standard case and Tower Lines, Inc., submitted a bid of 20.4 cents per standard case. Tower Lines, Inc., was permitted to continue furnishing services to the Liquor Commissioner at a higher cost without a contract for a number of months although Russell Transfer had submitted a lower bid the second time the State advertised for bid proposals. On the second bidding the State solicited non-resident common carriers to bid because witness Karle had not been advised that the original contract with Russell Transfer, Inc., had been cancelled for the purpose of preferring West Virginia vendors.
The above explicit review of the evidence has been made because of the importance of this case and the effect it may have on future business practices of the State. The evidence is uncontradicted in this unusual situation and clearly brings us to a legal conclusion that a valid contract was executed between the parties, enforceable *46 in any Court of law, signed and approved in compliance with the statutes of the State of West Virginia and freely admitted by witnesses for the State to have complied with the standard purchasing practices of the State under Chapter 5A, Article 3, of the Code. The only matter remaining for determination by the Court is whether a contract once executed after a meeting of the minds may be cancelled by the State and re-bid with a slight modification in order to comply with a directive from the Governor’s office. We find under the circumstances of this case that the issue of the purchase order is a ministerial act, and the destruction of it was arbitrary and capricious and in no manner nullified a written and legally enforceable contract between the parties. The evidence shows that the State arbitrarily refused to perform a valid contract because of a directive from the Governor’s office which has no basis of law, statutory or otherwise. Commendable as the Governor’s policy may be to give preference to West Virginia vendors, it appears that such a policy cannot be permitted to impair the obligations of a valid contract and particularly when the authorized agents of the State who negotiated the contract were not aware of such a policy. There are many pitfalls in contracting with a governmental agency, and to permit nullification of contracts on the ground of administrative policy would make it unsafe for any vendor to enter into contractual arrangements with the State. The intention of the parties under such circumstances would never be clearly expressed in the contract and legal rights and responsibilities under the contract could not be defined. Contracts should be administered and complied with in good faith and once all requirements are complied with, parol and extrinsic evidence should not be introduced to impair vested contractual rights.
The Supreme Court of Appeals in the case of Wysong v. Walden, 120 W.Va. 122, 196 S.E. 573, 52 S.E. (2d) 392, held that where the lowest bidder is financially and morally responsible, if his bid is rejected through fraud or corruption by a Board of Education, such rejection constitutes a violation of official duties, justifying the removal of officers guilty thereof. This Court on the evidence before it, of course, is making no finding of fraud or corruption on the part of the purchasing agents of the states, but is citing the above case in support of its holding that the State has a limited discretion in rejecting the bid of the lowest responsible bidder who is able to *47 efficiently perform the terms of a contract. Although financial responsibility alone may not be sufficient to meet the qualifications of the “lowest responsible bidder,” as provided by the West Virginia statute, the public interest requires the State agencies to accept the lowest bid when eligibility has been established in all other respects. The Governor’s policy of giving preferential treatment to resident vendors because they contribute to our tax base, or to union labor in order to avoid labor strife, may be well grounded but it is difficult for this court to hold that such a policy will justify the cancellation of a legally executed contract or the destruction of a purchase order duly signed and approved, without implementation of that policy by legislative enactment. Our legislature has not seen fit to incorporate this policy in its bidding and contract awarding procedures, although the Governor has made recommendations along that line. We are constrained to hold that administrative policy of the Governor cannot override the legislative intent as it now appears in our statutes. (Chapter 5A, Article 3, Code).
Inasmuch as the claimant has no remedy against the State in a legal action because of sovereign immunity of the State from suit, the Court of Claims was created to enforce contracts which should be binding upon the State. The maxim “for every wrong there is a remedy” is now applicable to the State where injury results from the breach of a contract. The State had a moral obligation to perform its duly executed contract when the legislature declares the existence of a contractual obligation, incurred by following the regular purchasing procedures set forth in the statutes. Discrimination and preferences, however well-intentioned, cannot be permitted to nullify duly executed contracts by taking advantage of technical defenses such as withholding the issuance of a departmental purchase order or destroying such an order, after it has been signed and approved, in order to get it out of the file.
In an original mandamus proceeding, State ex rel. Bache & Co. vs. Gainer, 177 S.E.2d 10 (1970), our appellate court held in an opinion written by Judge Haymond that Chapter 5A, Article 3, of the Code, related only to the purchase of commodities and printing of the departments of the State government, and not to contractual services furnished by a financial advisor-on a road bond issue. This decision casts some doubt on whether the purchasing practices of the State have application to a so-called liquor hauling contract. *48 Since this Court has made a finding that even under the regular purchasing procedures, a valid contract had been made between the parties, it is not necessary to decide whether this type of contract is within the purview of Chapter 5A, Article 3, of the Code that relates to purchase of commodities and printing. If the express mention of commodities and printing in that statute impliedly excludes contracts for the transportation of liquor, then the approval of the Commissioner of Finance and Administration, the Director of Purchasing, and the issuance and deliver of a purchase order presumably would not be required in a contract of this nature.
Having' resolved the liability of the State of West Virginia for damages resulting from breach of a legal contract that had been executed and consummated (except for delivery of an executed copy of the contract to the claimant and the administrative issuance of a purchase order), the next question before the Court is the award of damages proximately resulting from the default of the State. The evidence discloses that the claimant carefully computerized its anticipated expenses and gross revenues, based on the Liquor Commission’s record for the preceding year, and included an anticipated profit of 8 per cent of said revenues before taxes, said profit amounting to $40,000.00, and thereby arrived at a price of 19.6 cents per case. The latter figure was the amount submitted in its bid proposal. In addition thereto, ten trailers were purchased and adapted with specialized equipment at a cost of $4,995.00 each. One of said trailers was returned to the dealer and full credit was received, and four additional trailers were sold without loss. The company has retained five trailers but has been unsuccessful in its endeavors to sell the same. Because of the alterations made in the trailers to adapt them to the particular specifications required in making delivery of liquor to the various State Stores, there is no ready market for the same. It was testified that eventually approximately 50 per cent of their original cost would be recovered via sale. In addition to the losses incurred in disposing of the equipment represented by capital expenditures, the claimant sustained many incidental expenses in the preparation for making deliveries beginning July 1, 1972, for painting the trailers, titling them, license fees, registering the equipment with the Public Service Commission, securing temporary authority as a common carrier, performance bond, insurance premiums, installing an alarm system as required *49 by the Liquor Commission on the trucks, computer rental, personnel charges, salaries, and other miscellaneous items which aggregate $7,825.17 insofar as they are allowable and directly related to the breach of contract. The party who is not in default is entitled to restitution for the losses sustained and the expenditures which it made in its preparation for the performance of the contract. It is the finding of this Court that an award should be made in the amount of $7,825.17 as compensation for the expenditures made by the claimant, $12,000.00 for the loss that will be sustained on the sale of the equipment purchased and adapted for use on the contract, and the sum of $25,000.00 for a reasonable anticipated gain to the claimant had the contract been performed. Although the testimony of an officer of the claimant was to the effect that the anticipated profit would be $40,000.00 computed on an 8 per cent return, trucking companies ordinarily make a profit of between 5 and 8 per cent on their hauling contracts. It would appear that an allowance of profits on the minimum percentage would be a reasonable certainty under the facts of this case, even after allowance for breakdowns and contingencies.
Before concluding, it is deemed advisable to respond to the able argument of the State as presented in the Attorney General’s brief.
The argument recapitulated is as follows:
1) Any bid on a State purchasing contract may be rejected.
2) Before a contract is effective, a purchase order must be transmitted to the Director of the Budget so that the proper account may be encumbered.
3) A contract contrary to the provisions of Chapter 5 A, Article 3, of the West Virginia Code, is void and of no effect.
4) A contract executed under the authority of a statute must comply with the statutory requirements or it is not binding upon the State.
5) Delivery is essential to the binding effects of every contract.
6) One who deals with an agent has the burden of determining the agent’s authority; or he acts at his peril.
7) Claimant should have waited until it received the properly executed contract and purchase order before proceeding to make *50 expenditures, as the State could have procured transportation under emergency authorization.
Unfortunately a review of the evidence does not support the State’s position but militates against it. It discloses no rejection of the claimant’s apparent low bid, and no communication from the State of any intent to reject. On the contrary, claimant was kept in limbo up to the scheduled date of performance. The State officials were aware of the claimant’s extensive preparations to perform the contract, and the expenditures being made, and cooperated to enable the claimant to qualify for performance.
The transmittal of a purchase order to the Director of the Budget for encumbrance of funds is intended for protection from overspending by government agencies. Funds in this case were appropriated and available and approval would have followed as a matter of routine had the signed and approved purchase order been transmitted. Instead it was removed from the file and dstroyed by Mr. Karle who stated that he felt it should not be in the file after Mr. Loy objected that the contract contravened executive policy. We consider the action by the Budget Director to be a condition subsequent which voids each and every purchase contract in excess of appropriated or available funds, and not a condition precedent to the binding .effect of a contract. It is an administrative function that establishes a contract to be within limits and designed to protect the State against overspending units.
The contract was executed in accordance with all provisions of Chapter 5A, Article 3, except for the budget account encumbrance which was not essential to its validity.
Delivery of a contract is evidentiary of the meeting of the minds, and although necessary and often essential, may be constructive rather than actual. In this case delivery is excused because claimant endeavored to procure a copy and was thwarted. Eventually it did receive a copy with the last page missing (the page containing the requisite signatures). The secretary in the Purchasing Division was instructed to deliver the contract to the claimant but withhold the “signature page”.
The evidence clearly showed that all of the State agents acted within the scope of their statutory authority in the negotiation and *51 signing of the contract, and but for the belated interceding of the Governor’s Assistant the contract would have been performed rather than repudiated.
The availability of emergency transportation, it would seem, is irrelevant to the fundamental issue in this case — whether there was a binding and legal contract between the claimant and the State of West Virginia.
For the reasons hereinbefore stated, an award in the aggregate amount of $44,825.17 is made to the claimant. It is the opinion of the Court that this amount would fairly compensate the claimant for the defaults of the State under the special circumstances of this case and that in equity and in good conscience the State should pay said damages as a result of its failure to permit the claimant to perform its contract. Said award affords no compensation to the claimant for the time and effort expended by its officers in preparing to bid or negotiating the contract, meeting all requirements, securing the necessary permits and otherwise preparing to perform.
Claim allowed in the amount of $44,825.17.